S.E.C. v. Conti-Line. Mr. Lambert? Or is it Lam-bear? How do you pronounce it? Lambert. Lambert. Lambert. Okay. So, Mr. Lambert, you have reserved two minutes for rebuttal. Yes. That gives you eight minutes to begin. May it please the Court, my name is George Lambert. I represent Michele Conti-Line, who is the petitioner, appellant, and the defendant in the case. The thrust of this appeal is the interpretation of the authority of the U.S. Supreme Court. Charles Yu v. The Securities & Exchange Commission, which was decided on June 22, 2020. This Honorable Court is asked to refresh or remind the Securities & Exchange Commission that this case actually limits the latitude with which the SEC approaches the freezes of the funds. Unfortunately, regrettably, the U.S. District Court entered the version of the preliminary injunctive order in the form that the SEC had proposed. Can I interrupt for a second, Mr. Lambert? I mean, since this appeal was filed, there's now been a trial and a finding against your client, correct? Your Honor, that is correct. But there's no judgment yet issue. Is that also correct? That is correct, Your Honor. But once there is a judgment, whether the disgorgement amount and the penalties are higher or lower than the freeze number, the freeze becomes irrelevant, right? It basically disappears. Am I right about that? Your Honor, there are two circumstances which might indicate that it is still relevant. As you correctly pointed out, the judgment has not been entered. The jury trial took place in December last year. When is the sentencing scheduled for? The sentencing has been partially taken place, and there have been two sessions. But there has been no criminal judgment, so it's also not concluded. There is no criminal judgment. So the sentencing has taken place, but there just isn't a final judgment? Yes, there is no... Was there an amount set? Was there a dollar amount set? Well, from the oral arguments of the sentencing, what I heard is that the amount would be $6.1 million. That is to be restitution. But this all happened just last week, right? This is December 5th? That is correct, Your Honor. So, I mean, there was a sentence of 51 months and restitution of $6.1 million. That is correct, Your Honor. Okay, but in the SEC action, there has been a finding against your client and the judgment we're still waiting for. But once that judgment comes down, then all of this is moot. Am I right about that? All of what we're arguing on appeal is moot. Your Honor, it seems to me that the U.S. District Court awaits the disposition on appeal because it will make an impact upon the ultimate judgment in that case. Why would it make an impact? I mean, if the argument is whether the freeze has to conform to what the ultimate award is or it can be broader, that issue wouldn't be presented if you actually have a final award of disgorgement, right? Because then it would be, okay, here are the assets that are being turned over. Your Honor, one of the arguments that we are making is that regardless of the practical impact, still this honorable court should address the interpretation of the case law of the U.S. Supreme Court. And if the interpretation was not correct, then this appellate court should make a statement that this is not what the U.S. Supreme Court said, including Justice Sotomayor who penned that – Maybe there's an exception to mootness because maybe it's hard for us to review asset freezes if there's a short turnaround by the final judgment. I don't know. We could think about that. But your argument about the scope of the freeze is that it shouldn't reach untinted assets. Is that right? Yes. One of the major points is that Justice Sotomayor wrote equity does not lend help to penalties. So that's the huge thing. So I saw that Justice Sotomayor wrote that. So I would have thought your argument then would be not that you couldn't freeze assets that were untinted, but you couldn't freeze assets in expectation of awarding a civil penalty. It seems like you made that argument earlier in the proceedings. I'm not sure you're raising it on appeal. But is that part of your argument that because the Supreme Court has said that equity doesn't lend its aid to the enforcement of a penalty and here an equitable remedy is being used to preserve assets for a civil penalty, which is a penalty, that that's improper? Well, the mere disparity of the amounts speaks for itself. For instance, as the criminal case has shown, Michele Cantile misappropriated $6.5 million. In this SEC case, the preliminary injunction order is $46 million. This is a grotesque disparity. Right, but I guess my question is why is the disparity improper? Is it because in order to award an asset freeze, the district court has to decide in advance exactly what the amount of disgorgement is going to be? Or might it have been improper for the district court to say I'm going to award an asset freeze not simply in order to preserve an eventual disgorgement award, but also a civil penalty? And as you're saying, as the Supreme Court has said, equity doesn't lend itself to the enforcement of a penalty. By implication, Your Honor, that means that the district court makes a prejudgment that no matter what happens in the case, there will be a penalty. And that's probably not just and fair. Well, there could be a penalty, it seems to be. It's not ruling one way or the other. But I guess I'm also trying to figure out why, whether it's $23 or $46 or $102. I don't understand. I mean, is there any suggestion that your client has assets above $23 or above $6 that are being tied up by this asset freeze? There are no suggestions. There was no evidence. At the present time, the defendant is essentially a pauper. He doesn't have assets, free assets, almost nothing. So in this case, the SEC was extremely aggressive. OK, but whether it's a six, I mean, you seem to be suggesting that it could be $6 million. That wouldn't offend you. Am I right about that? That number was negotiated in the pre-bargain as what he was obtaining as a salary and didn't report to the investors. So he misled them. So, yes, that was negotiated. That was proven on the record. But $6.1 million is approximately eight times less than the reach of the permanent injunction order. The question is, does he have more than $6 million in assets? In my understanding, and I'm not the client, he has nothing. Nothing at all. Does this really matter? If he doesn't have assets above $6 million, why does this matter? Well, because this is a matter of rights, important rights. And the next point is constitutional rights. When the permanent injunction prohibited Mr. Cantillo to have a loaf of bread on his table because it was all prohibited by the reach of the... Was it prohibited? I mean, the district court made a determination that he was incarcerated at the time, right? And so wouldn't need the money to pay for a loaf of bread. But it did seem open to the possibility that if you were under different circumstances and needed the money, that maybe the freeze would be different. Your Honor, there are commissary accounts in the incarceration institutions. Those are important rights for inmates. He cannot buy anything from a commissary, which includes a proverbial loaf of bread. That's actually... But all of this only matters if he had assets above $6 or $7 million, which you seem to be conceding is what was, that was legitimately seized, right? You're quibbling with the number more than anything else. And you're not suggesting that $7 million would be too high, are you? As a matter of fact, we do, because the evidence at the trial in the SEC case, and by the way, it was after the preliminary injunction. We wanted to raise the issue that my sister in the profession used the factual allegations after the preliminary injunction order. And we have doubts that it's permissible. But since the honorable judges say it's possible to discuss that, yes, of course. Then I'll approach that. The factual circumstances right now is that McKinley-Cantile is prohibited from getting any commissary privileges. Then there are telephonic calls. All that matters, especially for... Can I ask this question? I mean, as I read the opinion from the magistrate judge, he said, well, I don't see any evidence that he needs money for expenses because he's incarcerated. But I'd be willing to reconsider that if there was a suggestion that he was. Did your client ever say, well, I need money for the commissary because I could buy food that way? Yeah. It is very important because my client is seriously ill. I'm not disclosing the medical records, but we are talking about six life-threatening situations. Those are extremely expensive. The BOP doesn't provide the accommodation of those medical surgical interventions. He needs to see specialists of the U.S. Marshals. I mean, I don't doubt that he might have that need or even that he might want to buy stuff from the commissary. I'm just saying as I read what the district court said, it was, I don't see a need on this record for money for food or other expenses. But if there were such a showing, I might modify the freeze. I just am asking, did he ever go to the district court and say, well, actually, I do need money for the commissary or for medical treatments, and that's how it would make a difference? And the district court then denied the modification. When your owner said, I see, let me disclose this. My client weighs 405 pounds. He is in extreme medical situation. He suffers. The question is, did he go to Magistrate Judge Gorenstein and say, I need X dollars a month for the following expenses? Did he do anything along those lines? Yes, Your Honor. We have been negotiating with the SEC that he needs this amount or that amount. There should be a carve out. Is that in the record? It was in the meet and confer with the SEC, the email exchanges. But the position that the SEC was taking was extremely discouraging. Right, but you never went to the district court or your predecessor never went to the district court to say, hey, we want to revisit this. He has needs, and we need to be able to reduce the asset freeze so he can get access to his fund. There's nothing. He didn't do that, right? Well, actually, the briefing for the permanent injunction hearing said all that. He needs this and that. The carve outs, those should be, it actually has constitutional underpinnings that it should be reviewed in the permanent injunction order. No person, no human being may survive if he doesn't have the food for several weeks. No person. Well, I guess if in fact it were true that your client were incarcerated and so his food and other care was taken, was provided to him, and he did not have the ability to use other funds to purchase extra food or to get extra medical care or anything like that, and it made no difference, would it still be required for the district court to carve out an exception to the asset freeze to allow for the use of funds? Yeah, the way the SEC, we had multiple meetings conferred with SEC that there are such circumstances, such circumstances, but those were extremely discouraging that he does need that. He's not entitled to that. That will not be done. And now, so this kind of overreaching attitude of my colleagues at the SEC was extremely discouraging. Well, we've gone way over, but you've got two minutes for rebuttal, Mr. Lambert, so we'll now hear from Ms. Parisi. Am I pronouncing that right? Yes, thank you. Perfect. May it please the court, Emily True Parisi for the Securities and Exchange Commission. It is undisputed in this appeal that an asset freeze was necessary to prevent the dissipation of assets, preserve the status quo, and protect the court's jurisdiction to enter judgment for the benefit of hundreds of harmed investors. Well, so you say for the benefit of hundreds of harmed investors, but so Mr. Lambert pointed to this passage from Lew that says equity never lends its aid to enforce a forfeiture or a penalty, and 77U says that it has to be equitable relief and also that it has to be for the benefit of investors. So when the district court enters an asset freeze in order to protect assets for a civil penalty as distinct from disgorgement, isn't that outside the equity power? Isn't that equity lending its aid to enforce a forfeiture or a penalty? A couple of responses, Your Honor. So the district court here applied the controlling law of Unifund in the circuit that says freezes are appropriate for both. Well, we said that in Unifund, right? So we said that in Unifund, but then subsequent to Unifund, you had Grupo Mexicano that says equity does not allow you to freeze assets in expectation of a non-equitable remedy. And then we have Lew, which explicitly says equity never lends its aid to enforce a forfeiture or a penalty. Doesn't that just change the way we should think about whether it's appropriate to use equitable relief in order to protect the ability to award a forfeiture or a penalty? I think, so, Your Honor, that question could be implicated in another case, but I don't think it's implicated here. I think, as your question to my friend pointed out, the defendants haven't argued here that, in fact, they've affirmatively conceded that a freeze for penalties is appropriate here. They just argued about the amount. You can see that at Blue 54, but you can really see it in the district court where they explicitly say, first they say it should just be $7 million for the discouragement, and then they- Yeah, so maybe it's waived. I don't know. It seems like earlier in the case there's this opinion from Judge Marrero in 2022 where he does seem to address this point as to whether the freeze can reach the civil penalty also. But putting aside whether it's waived, I guess, do you have a position on that? Like, doesn't Lew say that actually you can't use equitable relief to enforce an eventual penalty? I think it's waived here, Your Honor, and the other thing I would- so I don't think that this would be the case where we haven't- No, I get it. Maybe it won't. I'm saying put it aside waiver. Do you have a- Where we haven't briefed it. I mean, I think if the court wanted to reach that here, we would want to brief the issue. But I would say even in cases like the Ninth Circuit post-remand in Lew and the ETS payphone cases and more post-Lew cases, they're clear that having a freeze for both discouragement and penalties doesn't render the entire character of the freeze non-equitable, and especially- Yeah, well, it does seem like there are two circuits that have said something like, well, it's true that you can't use equity to enforce a penalty, but if you're enforcing discouragement and a penalty, then we think you can do that because they're together. But that seems very odd, right? Because normally you should have authority for every remedy you're providing. And so if you're providing an asset freeze for a non-equitable remedy and an equitable remedy, it seems weird to say that one can carry the other along with it. And certainly the equity courts did not do that. And so if we think about the equitable powers in terms of what the equity courts did at the time of the Constitution and the Judiciary Acts, it does not seem like that is a traditional power in equity, right? So I think what the courts that have found that have based it on is the early stage of the PI freeze where you may not be sure what the final amounts are. And so it may be premature to parse out what part of the freeze is discouragement, what is penalties. And that's especially when you're- The district court didn't have that problem here, right? The district court said, okay, here's the amount of discouragement I'm going to award, and then here's the amount of a penalty. Or here's an estimate of what might be awarded on discouragement, and here's an estimate of the penalty. And so the freeze covered both, right? So he did separate them out, or the district court did separate them out. That is certainly how the district court approached it. But, again, I think as some of the questions to my friend point out, I mean, I think it is sort of academic in this case because there's no suggestion that the amount of assets would go beyond the discouragement amount. So, again, I don't think this case is the right vehicle to raise the interesting questions Your Honor raises. Well, I guess I have some other concerns about this case. I mean, there is a decision. There's everything but a judgment in the district court, right, that we've now had a trial. We've got effectively an award that is about to be issued and a judgment issued that would be final, correct? Yes, Your Honor. And once that happens- The fully submitted remedies motion. Then what does that mean for the preliminary injunction of the asset freeze? As Your Honor said before, the preliminary injunction merges into a final injunction, and then it moves into a collections phase. There's a collectible judgment. That would then be separately appealable, right? Yes, correct, Your Honor. The final judgment would certainly be separately appealable. The freeze is vacated, or what? How does that work? There's a freeze on $46 million, but once there's a judgment for a certain amount, and if that amount is less than $46, what happens? Right. If that amount is less than $46, then the district court retains supervision over the collections phase. So the court would, there would attempt to be a collection for whatever assets there are, and if it's less than the amount, then there would be a collection phase that the district court would supervise. Right, but there's right now an asset freeze, and so if the judgment of the district court were $10 million or $6 million, then the freeze order would be reduced, or it would just be vacant? This isn't a final judgment. Right, correct, Your Honor. It would just go away and emerge into the final. And then there would be an appeal, both to the verdict and to the judgment, perhaps. Yes, Your Honor. That's exactly right. And so what's holding this up? Your Honor, I do not know. It has been, I believe the remedies motion was fully submitted in the spring. It's been a little over six months now then. Is there any reason to think the district court's waiting for us? I do not think so, Your Honor. Because the trial took place during that same interim, right? Yes, Your Honor. There's no indication in the record of why it has taken a little over six to eight months for the remedies decision, but there's certainly no indication that the court is waiting for Your Honors to rule. I think it's just a press of district court matters would be my guess, but there's nothing in the record. I suppose it could be possible that there's some other consequences from the asset freeze. I mean it does make the suggestion that he could have paid for counsel of his choice, although I don't know if he makes an argument that he actually would have hired different counsel. But I suppose that issue would still be part of the appeal from the final award. It wouldn't be here. Correct, Your Honor. The asset freeze was only about freezing assets. There's no bond that he wants returned or something like that, right? Correct, Your Honor. It's only about freezing assets. Those are appealable issues on a final judgment. And as I think Your Honor alluded to, there's been no – and as the district court found, he never actually averred that the freeze was preventing him from obtaining criminal counsel of his choice. He just said that may happen in the future, and the district court did not abuse its discretion in saying, if that happens, come to me, but it hasn't happened yet. Okay, so that might be – so maybe it's moot. I guess I have two questions. Is it possible that just asset freezes in general are hard to review because they're only preliminary to a final judgment, and so maybe there's an exception to mootness? I don't think they're usually this hard to review because usually they happen at the beginning of the case and there's more time between the case and final judgment. The procedural history here is a little bit strange. The defendant conceded to the imposition of the TRO for two and a half years and then only challenged the propriety of the asset freeze right before the liability trial. So I think the procedural history here is a little strange. So if he had challenged it up front, there would have been years to review the asset freeze, and so it probably wouldn't have evaded review. Yes, correct. And what about the point – so then putting aside the mootness question, what about the point he makes about obviously he needs to have money to buy things from the commissary? Isn't that just an obvious thing that the district court should have taken into consideration? I think, again, Your Honor, the district court certainly did not say that per se such a carve-art would be impermissible. It just said that the defendant hadn't made any application. And remember, at the time of the hearing, he was not yet incarcerated. He represented he was living in Russia. So the application for living expenses that was before the district court was when he had not yet been arrested by German authorities, and so his application for living expenses was to live in a home, essentially a vacation home in Moscow. And then the circumstances changed. He was arrested by German authorities. Doesn't that make it even more of a problem? If, in fact, he was supporting himself with his own resources, then wouldn't it mean that a denial of money for living expenses actually did deny him the right to support himself? Well, I think the timing is important, Your Honor. It was in between the hearing and the decision. The court noted that that was when he was arrested. And so the court said, again, not that living expenses carve-out was somehow per se impermissible, but that the entire basis for the application before him had changed. Now that he was incarcerated in Germany, he was later subsequently extradited to the U.S. Okay, so the decision actually is that he was incarcerated. Do you think that's the ground on which the district court decided not to have the carve-out? Yes, I think you can see that very clearly. It was that he was incarcerated and he was premature. I didn't realize that you referred to before he was incarcerated. So that's the ground. And you think if he had said, well, look, I need money for the commissary, the district court might have modified the scope of the freeze? I think the district court was very clear in Note 18 that if he had made a specific application that was actually based on his actual circumstances that had changed, that the district court was open to entertaining it. He just never made that application to the district court and still hasn't made that application to the district court. But apparently, as he says, he was negotiating with the SEC and the SEC wouldn't agree to it. Is that accurate? I'm not sure which negotiations he's talking about. There are certainly in the record negotiations before the preliminary injunction hearing. We put them in our brief. The SEC said that this was when he was not incarcerated. They were going to agree to a $3,000 a month carve-out for many future earnings subject to certain safeguards, and the defendant would not agree. My friend may be referring to meet-and-confers more recently with trial counsel, of which I'm not privy to, but I know the record does not reflect that anything about Mr. Contole's recent circumstances have been brought to the district court. But even if the SEC didn't agree, he could still make a motion to the district court, right? Yes, that's precisely my point, Your Honor. Again, I don't know the extent of the meet-and-confer, but I know nothing has been presented to the district court, and there's nothing preventing him from doing so, especially when the district court Put it just so I'm clear. Is there some law out there that I'm missing that says that a detained defendant who's got an acid freeze on him is entitled to snacks at the commissary? I am not aware of that, Your Honor. Again, though I This is money that would otherwise go to disgorgement so that victims could be made whole, right? Yes, there are hundreds of harmed investors who are waiting for disgorgement. And so I am not aware of that, Your Honor. I just was simply pointing out that he hasn't made that The medical treatment point might be more serious. His medical treatment might be of more serious interest, right? But the point is just that it's not obvious that he wouldn't have been able to get access to the resources. Yes, Your Honor, that's precisely Wait, I'm missing something, too. Does the Bureau of Prisons allow people to come in and bring their own concierge doctors to the BOP? I am also not aware of that, Your Honor. I know that the medical issues are being worked out in the criminal context. They are not before the court. But should Mr. Contoli need medical expenses, he has not asked this before. He's not asked for anything. Correct. Snack money, medical, anything. Correct. I see I'm over my time. If there are no further questions, we would ask that the district court's order be affirmed. Thank you very much, Ms. Parisi. Thank you. Mr. Lambert, you have two minutes for rebuttal. Thank you, Your Honor. I need to make several clarifications. The district judge in Nevada ruled orally that he would be placed in a camp, which is under the auspices of the BOP. But at a camp, they do have access to medical treatment outside of the BOP. That's all way later. We're talking about an asset freeze now that has been in some ways superseded by a criminal judgment, which I think has been committed to everything except paper at this point because it happened last Thursday, I think. But he now has a judgment, a restitution judgment against him for $6.1 million, right? He will have probably any day, but it hasn't yet happened. And what I heard from the district judge in Nevada, she is planning to recommend to the BOP to place Mr. Contilla in a camp, which means that he could use the medical expense, medical treatments outside of the BOP. But he's not going to get to take money that would otherwise be going to the restitution, the victims under the restitution order, right? You're not suggesting that, are you? No, no, no. What I was due to the investors, that's a separate topic, but there could be funds from his inheritance, which have nothing to do with the SEC's case. Mr. Contilla got the inheritance that was a settlement from the mesothelioma failure concerning his mother, and we are talking about an amount of $400,000. It has nothing to do with the SEC. It has nothing to do with anything at all. He has been unable to use that fund. The next clarification concerning the JARCISI case, and I'm answering the question which was posed by the honorable judge, why it takes some time. The JARCISI case on June 30th this year actually changed the landscape in which the SEC operates. Now, in order to make a judgment under the new case law of JARCISI. Yeah, but wouldn't that be a reason why you could challenge the SEC's final judgment that's entered in this case? Does that have implications for the asset freeze? It's all interwoven. I was the one who filed the notice of supplemental authority of JARCISI because that makes a gigantic difference. I understand how it might affect the authority of the SEC, but how does it affect the authority of the district court to enter the asset freeze? Well, we are talking about the time frame. If the district court rules that the December verdict from last year is vacated because of JARCISI, there's going to be a new trial for the jury to determine. But then there would be a new asset freeze, right? So the way this is going to happen is there's going to be a final judgment and the asset freeze is dissolved. And then maybe you'll successfully challenge the final judgment if you think that you have an argument based on new authority, maybe. But if you do succeed in that, then if there's going to be a new trial, there would be a new asset freeze. But maybe there wouldn't. Maybe you're not going to succeed. Maybe the SEC is not going to pursue it. I don't know if we can speculate about what's going to happen and whether there's going to be a second asset freeze. Your Honor, in my personal understanding of the district court, it is aware of the JARCISI case and the implications. The implications for what? That the judgment may not be issued from papers. It goes to the jury. That's the JARCISI case. It's a new case, June 30, 2024, Your Honor. That's a new landscape, as I mentioned, for the SEC to operate. In order to make a judgment against Mr. Cantillo, it is our position, relying on the JARCISI case, that a new trial needs to be- But that's not this appeal. I mean, that's going to be appealed down the road once you have a judgment on the case that the jury returned a verdict on. Yeah, that was in response to the point how much it is relevant. Yes, it's relevant. If Judge Marrero rules, yes, I am going to apply the JARCISI case law. I'm going to schedule a new trial where the jurors would have the questionnaire how much Mr. Cantillo owes to the investors. Then it could take another year. In the meantime, Mr. Cantillo is in duress medically, humanely, in any way you could mention it, a man of 405 pounds. Okay, I understand that argument. So Ms. Parisi said that in this case you're not actually challenging the authority of the district court to enter an asset freeze in order to preserve assets for an eventual civil penalty. Is that true? No, that's not true. Essentially, the contest was across the board, starting from the point that the SEC has never produced an expert to prove the numbers. Instead of the experts, the SEC put forward an attorney of law from the SEC, and she testified actually – But that's an argument that the number for the civil penalty is inaccurate. But the question about whether you could have an equitable remedy that is in service of a non-equitable remedy, which is the civil penalty, that's a legal question. Well, in my understanding, Mr. Cantillo has not conceded anything other than – He agreed to an asset freeze that included $23 million to cover a civil penalty, and he agreed to that for two and a half years, right? No, that's a misstatement by my honorable colleague. There was a stipulation for such an asset freeze that was in place for two and a half years. Is that not right? Well, there were several stipulations. It was postponed. Did he at any time argue that the $23 million that was intended to cover a prospective civil penalty was improper? At all times. He never agreed to this number. He opposed that at all times, but yet he entered into the stipulation. I'm having trouble following. No, no, no. The TRO, the extension of the TRO, just postponing until a preliminary injunction hearing, that's one thing. So it was stipulation just about the time frame. You're saying you agreed to it just because you wanted more time for briefing or whatever, but you didn't actually concede that it was proper. Yeah, that is correct. In other clarification, Mr. Cantil was in Germany, actually, not in Russia at that time. There were logistical difficulties to put together the defenses. Also, the expert who testified for the defense, he's from Ancora, a very large accounting firm. He required some time. They went through all the numbers. Yeah, $6.1 million, so that was a salary which was unreported. And my client, Mr. Cantil, misrepresented to investors that he took his salary. But the point is that he believed that he didn't have to report that to the investors. He was wrong. He committed a crime. He is paying for that with his freedom. But $23 million was never stipulated. That is incorrect. I understand that my sister in profession was not in the case below. That's why she's not familiar with these facts. And the last point is this, that the expert for the defense, Mr. Stefan Vanka, he made a report, 460 pages. He was deposed. He was heard. But unfortunately, this report was not willing to create most of his testimony, his report. Instead, they relied on an attorney from SEC who testified. Actually, she admitted that she didn't count legitimate business expenses for calculating $23 million. She calculated only what the investors paid. And that was another issue why we believe that the permanent injunction should be overturned and sent back to the district court to sort this out. Thank you very much. Thank you, Mr. Lambert. And Ms. Parisi will reserve decision.